A. AUGUSTUS Low, Individually and as Administrator with the Will Annexed of ABBOTT A. Low, Deceased, et al., Respondents, *v.* STATE OF NEW YORK, Appellant. (Claim No. 30361.)

Third Department, March 11, 1953.

310

[redacted]

*Nathaniel L. Goldstein, Attorney-General* (*Wendell P. Brown. Solicitor-General,* and *Henry S. Manley* of counsel), for appellant.

*Theodore Cross* and *Francis C. Steates* for respondents.

FOSTER, P. J. Abbot Augustus Low (hereafter called Low, Sr.) owned a considerable tract of land in St. Lawrence and Hamilton Counties. In 1903 he built a dam across the Bog River in St. Lawrence County, near Hitchin's Pond, and created a reservoir of some 3,000 acres. The extreme westerly end of the reservoir flooded some land in Hamilton County, about thirty acres the testimony indicates, which he did not own. The precise location of those thirty acres is not revealed by the proof in the record before us, but it is not disputed that they lay in the triangle where the converging lines of township 38,

Totten & Crossfield's Purchase, meet the line between St. Lawrence and Hamilton Counties, and perhaps to some extent in the triangle to the north of that township. Low, Sr., owned no land in township 38.

On July 3, 1908, a representative of the Forest, Fish and Game Commission of the State of New York, wrote a letter to him which had this to say:

" Information has been laid with this office that you are holding back the Water in your Dam on the Bog River in the town of Colton, and backing water upon the lands of the State in the Forest Preserve on lot 2 northeast corner of Township 38, Totten & Crossfield Purchase, and on lots 38 and 39 ·in the triangle north of township 38, Totten & Crossfield Purchase, Town of Long Lake, Hamilton County. That thereby you have destroyed a large quantity of timber in the Forest Preserve, the penalty for killing of which is $10 for each and every tree so killed.

" This department will hold you to a strict accountability for your acts, and unless immediate settlement is made an action will be begun to enforce the penalties prescribed by law.

" You will further take notice that unless the water is immediately lowered to its natural condition I shall proceed by injunction to compel you to do so."

Other correspondence followed and apparently some negotiations were had. Finally in February, 1909, the matter was settled and compromised by payment on the part of Low, Sr., of $7,000. A written stipulation of settlement was made which reads in part:

" Whereas, on account of the raising of the water in a certain dam upon Bog river, certain lands in the town of Long Lake, Hamilton county, New York, were flooded and a quantity of timber killed thereon; said lands being described as part of Township 38 of the Totten & Crossfield's Purchase, — a part of the Gore of Township 38 of the Totten & Crossfield's Purchase, and it having been deemed advisable that the same matter be settled and compromised, without litigation,

" Now, therefore, it is stipulated, by and between the People of the State of New York, by the Forest, Fish and Game Commission of the State of New York and A. Augustus Low, the owner of the dam and of the lands adjoining the same, that the same be and hereby is settled and compromised upon the payment by the said A. Augustus Low of the sum of Seven thousand ($7000.) dollars, the receipt whereof is hereby acknowledged and confessed."

Low, Sr., died in 1912. His widow and executrix died in 1928, and his estate was thereafter without representation until his son, Low, Jr., and one of the claimants herein, was appointed administrator, *c. t. a.* on June 30, 1950. Some time about 1930 the latter became suspicious that the State's representation of ownership of the flooded area in question was false. Three actions were afterwards instituted by him in the Supreme Court, and it was ultimately determined that the State had no title to two parcels in what is called the unallotted area or gore between the Brodhead and Campbell lines, so-called, and in a part of the triangle north of township 38. These parcels are to the north of a 335⅔ acre parcel which was set off to Low, Jr., in a partition action between him and the State, by a judgment, said to be interlocutory, entered on September 3, 1940. A final judgment was entered May 8, 1950. This action embraced a tract in which it was found the State had a five-sixths interest.

On July 6, 1950, claimants filed a claim with the Court of Claims for repayment of the $7,000 paid by Low, Sr., in 1909 to the State. The Court of Claims found "the lands in Twp. 38 and the N. Triangle of 38 flooded by the dam are partly in a parcel of 335⅔ acres in Twp. 38 partitioned to A. Augustus Low * * * and partly on the unalloted area or gore between the Brodhead and the Campbell lines." It was also found that the ownership and boundary lines of the questioned flooded area were falsely represented by the State, and the payment of $7,000 exacted from Low, Sr., under duress. A judgment for $20,000 against the State was granted. In its opinion the court below indicated that it felt the State guilty of a sort of constructive fraud or deceit. This was based largely upon the court's belief that the evidence supported an inference the State knew that its ownership of the flooded area was doubtful and unresolved, and hence that its representation of ownership was heedless and reckless, and amounted in fact to a concealment of the true situation.

We reach a different conclusion. The evidence is not sufficiently clear to support a finding that there was flooding of any vital significance on the "unalloted area or gore between the Brodhead and Campbell lines." If there was some flooding there the area covered was so small as to be of no consequence in the determination of this controversy. The State had no title to this area, but it did have at the time a five-sixths interest in the parcel of 335⅔ acres afterwards set off to Low, Jr., and it was there, so the reliable proof indicates, that the major portion of the flooding occurred. Respondents apparently concur in

this appraisal for they take the position that the material issue is not whether the State had no ownership or a partial ownership, but whether the State was the sole owner of the lands flooded. In fact the essence of their claim is that the State exacted a penalty of $7,000, which it could only do, under the statute existing at the time, if it was the sole owner (Forest, Fish and Game Law, §§ 221, 222; L. 1900, ch. 20).

After a lapse of some forty years it is quite impossible to determine what the parties had in mind when they agreed upon a settlement for $7,000. As the owner of a five-sixths interest doubtless the State might have obtained injunctive relief, and its demand in 1908 threatened that as well as the exaction of penalties. Under the statute cited it could exact penalties if it were the sole owner, but under the same statute it could also have brought an action for trespass as a part owner. The demand and the stipulation of settlement does not indicate that the threat of injunctive action was a consideration for the settlement, but it may have been in part. No one can now tell with certainty.

On the issue of fraud it is unnecessary to unravel the complicated proof of title upon which the respondents largely rely, beginning as it does with the north line of Totten & Crossfield's Purchase as laid out by Campbell and Stanborough in 1772, and ending with the 1894 deed from Webb to the Ne-Ha-Sa-Ne Park Association and the 1896 deed from Webb and the Ne-Ha-Sa-Ne Park Association to the State. That there had been survey errors in laying out lot lines in the general area, running back to 1797 when Brodhead ran an erroneous line to the south of the Campbell line, may be conceded. It may also be conceded that the State had knowledge of such erroneous surveys, but whatever the errors may have been the fact remains unaltered that the State in 1908 had a five-sixths interest in the tract partitioned in 1940, and had a fairly sound reason for believing that it owned the complete title. As indicated before, the proof is too nebulous to support a finding of any substantial flooding on the gore between the Brodhead and Campbell lines. Hence we are relegated only to a consideration of flooding on land in which it is conceded that the State had a five-sixths interest.

Apparently the 1896 deed from Webb and the Ne-Ha-Sa-Ne Park Association to the State described the tract afterwards partitioned but excepted it from warranty, indicating a doubt as to the validity of the title. In 1898, Webb gave another deed to the State, conveying a five-sixths interest in this tract. Respondents argue that the State ought to have known in 1908

when it made a demand on Low, Sr., that it was not the sole owner of this tract. However, in 1898 this court held that the State once had a complete title to this tract under an 1843 tax sale of an area which embraced the tract in question (*Marsh* v. *Ne-Ha-Sa-Ne Park Assn.*, 25 App. Div. 34). In 1855 the State conveyed the premises to the Sackett's Harbor and Saratoga Railroad Company and thereafter there was a devolution of title to the Ne-Ha-Sa-Ne Park Association (see dissenting opinion, p. 46). The latter, in company with Webb, thereafter conveyed to the State as heretofore indicated. Hence if this court's decision in 1898 was correct title came back to the State. This apparently complete and adjudicated title was not upset until the decision of the Supreme Court in the partition action in 1940. Hence the State in 1908, despite its knowledge of surveying errors in the general area, had a fairly sound reason for believing that it had a complete title to the tract afterwards partitioned.

Therefore it seems to us that a finding of fraud, actual or constructive, on the part of the State was not justified. It requires no citation of authorities to support the elementary proposition that fraud is never presumed and must be proven by substantial evidence. After a lapse of some forty years the evidence of fraud should be fairly clear and convincing if the State is to be held liable. In our opinion there is no convincing proof that the representatives of the State deliberately deceived Low, Sr., or were so reckless and heedless in their representations that constructive fraud resulted. Indeed, from this record it cannot be told whether Low, Sr., was deceived at all. No one can now say what he knew about the title to the land he flooded, and the same sources were available to him that were available to the State.

Since we find the evidence insufficient to sustain the charge of fraud and deceit we do not reach other issues argued. However, we are by no means satisfied that the claim, in any event, was timely presented. The theory that the claim, assuming it was a valid one, did not accrue until the final judgment was entered in the partition action in 1950, we regard as extremely dubious.

The judgment should be reversed and the claim dismissed.

BERGAN, COON, HALPERN and IMRIE, JJ., concur.

Judgment reversed, on the law and facts, and the claim dismissed, with costs.